## CAROLINE LOUISE CARTER

*v.*

## LESLIE CARTER.

*Filed at Ottawa October 29, 1894.*

1. QUESTIONS OF FACT—*verdict upon, when conclusive.* Where the charges of a complainant's bill are specifically denied and the evidence is conflicting, the verdict of the jury will be final, unless error is shown

2. ADULTERY—*may be inferred from circumstances.* Adultery may be shown by proof of circumstances which naturally and by fair inference lead to the conclusion that it has been committed.

3. EVIDENCE—*competent if applicable to some of the issues.* Although the bill does not charge adultery with a certain person, it is not error to admit evidence which incidentally tends to show such adultery, provided such evidence is competent upon other issues made by the pleadings, and is confined, by instruction, to those issues.

4. SAME—*the best evidence must be produced.* The best evidence the nature of the case admits of must be produced. What a party *understands* or *believes* is properly excluded. Those who *know* the facts should be produced, and swear to them.

5. SAME—*letters becoming part of res gestœ are admissible.* Where a difficulty is admitted to have taken place between a husband and wife, but the cause thereof is in dispute, the husband, who swears that the cause was the reading by him to his wife of certain unsigned letters found in her possession, may properly read the letters to the jury as part of the *res gestœ*, even though their contents tend to prove improper conduct not charged in the bill.

6. SAME—*when witnesses other than experts may give opinions.* A witness who is not an expert may give his conclusion and the results of his observation, when the matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness.

7. Therefore, it is not error to permit a witness to give his opinion from sounds, noises and conversation heard in an adjoining room, that an act of adultery took place, particularly where the sounds heard and the conversation detailed were so conclusive that the opinion of the witness added nothing to their force.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. EGBERT JAMIESON, Judge, presiding.

Mr. SIDNEY SMITH, Mr. WM. J. HYNES, Mr. R. W. MORRISON, and Mr. JOHN J. HERRICK, for the appellant :

The general rule as to what evidence of adultery is necessary in divorce proceedings is, that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion that the adultery has been committed. *Loveden* v. *Loveden*, 1 Hagg. Con. 3; *Williams* v. *Williams*, 2 id. 299; *Pollock* v. *Pollock*, 71 N.Y. 137; *Conger* v. *Conger*, 82 id. 603; *Beadleston* v. *Beadleston*, 2 id. 809; *Berckmanns* v. *Berckmanns*, 1 C. E. Greene, 122; *Blake* v. *Blake*, 70 Ill. 618; *Mayer* v. *Mayer*, 6 C. E. Greene, 246; *Hamerton* v. *Hamerton*, 2.Hagg. Ecc. 13; *Harris* v. *Harris*, id. 376; *Platt* v. *Platt*, 5 Daly, 295; *Mosser* v. *Mosser*, 29 Ala. 313; *Freeman* v. *Freeman*, 31 Wis. 235; *Hart* v. *Hart*, 2 Edw. Ch. 207; *Carter* v. *Carter*, 62 Ill. 439; *Mount* v. *Mount*, 2 McC. Eq. 162.

It is an elementary principle of law that a witness must testify to facts. Thompson on Trials, sec. 377; *Chicago* v. *McGiven*, 78 Ill. 347; *Railroad Co.* v. *Railroad Co.* 67 id. 142.

What inferences shall be drawn from the facts testified to is a question for the jury. The opinion or inference of Crawford was a usurpation of the function of the jury. Lawson on Expert Evidence, p. 497, rules 65, 66, 67; *State* v. *Crawford*, 39 Kan. 257; *Parkhurst* v. *Masteller*, 57 Iowa, 474; *Cox* v. *Whitefield*, 18 Ala. 738; *Messner* v. *People*, 45 N. Y. 1; *Chicago* v. *McGiven*, 78 Ill. 347; *Railroad Co.* v. *Railroad Co.* 67 id. 142; *Watt* v. *People*, 126 id. 29; *Knoll* v. *State*, 55 Wis. 249; *Noonan* v. *State*, id. 258; *Knight* v. *State*, 6 Tex. App. 158; *Cameron* v. *State*, 14 Ala. 549; Thompson on Trials, sec. 377.

Mr. FRANK J. LOESCH, Mr. EDWIN WALKER, and Mr. LUTHER LAFLIN MILLS, for the appellee :

The exception to the general rule that witnesses can not give opinions, is not confined to the evidence of experts testifying on subjects requiring special knowledge,

skill or learning, but includes the evidence of common observers, testifying to the results of their observations, made at the time, in regard to common appearances or facts, and a condition of things which can not be reproduced and made palpable to a jury. *Commonwealth* v. *Sturtevant*, 117 Mass. 122.

Every person is competent to express an opinion on a question of identity, as applied to persons, things, animals or handwriting, and may give his judgment in regard to the size, color or weight of objects, and may estimate time and distances. He may state his opinion in regard to sounds, their character, from what they proceed and the direction from which they seem to come. (*State* v. *Shinborn*, 46 N. H. 497.) The correspondence between boots and foot-prints is a matter requiring no peculiar knowledge, and to which any person can testify. (*Commonwealth* v. *Pope*, 103 Mass. 440.) So a person not an expert may give his opinion whether certain hairs are human hairs. (*Commonwealth* v. *Dorsey*, 103 Mass. 412.) And a witness may state what he understood by certain "expressions, gestures and intonations," and to whom they were applied, otherwise the jury could not fully understand their meaning. *Leonard* v. *Allen*, 11 Cush. 241.

When a witness testifies that a horse's foot appeared to be diseased, he states a matter of fact, open to the observation of common men, (*Willis* v. *Quimbly*, 31 N. H. 485,) and it is proper for a witness to give his opinion that a horse appeared to be sulky, and not frightened, at the time of an accident, (*Whittier* v. *Franklin*, 46 N. H. 23,) or he may testify as to the qualities and appearance of a horse. (*State* v. *Avery*, 44 N. H. 392.) The question whether there was hard-pan in an excavation does not ask for an opinion. *Currier* v. *Railroad Co.* 34 N. H. 498.

It is competent for a witness to testify to the condition of health of a person, and that he is ill or disabled, or has a fever, or is destitute and in need of relief. (*Parker* v. *Steamboat Co.* 109 Mass. 449 ; *Wilkenson* v. *Moseley*, 30 Ala.

562 ; *Barker* v. *Coleman,* 35 id. 221 ; *Autauga County* v. *Davis,* 32 id. 703.) And one may testify that another acted as if she felt very sad. (*Culver* v. *Dwight,* 6 Gray, 444.) So those who have observed the relations and conduct of two persons to each other may testify whether, in their opinions, one was attached to the other. The opinions of witnesses on this subject must be derived from a series of instances passing under their observation, which they never could detail to a jury. (*McKee* v. *Nelson,* 4 Cow. 355 ; *Trelawney* v. *Coleman,* 2 Stark. 191.) A witness may also give his judgment whether a person was intoxicated at a given time, (*People* v. *Eastwood,* 4 Kern. 562,) or whether he noticed any change in the intelligence or understanding, or any want of coherence, in the remarks of another. *Barker* v. *Comins,* 110 Mass. 477 ; *Nash* v. *Hunt,* 116 id. 237 ; *Yahn* v. *Ottumwa,* 60 Iowa, 429 ; *State* v. *Shinborn,* 46 N. H. 501 ; *Burnham* v. *Sherwood,* 56 Conn. 229 ; *Railroad Co.* v. *Miller,* 39 Kan. 419 ; *Underwood* v. *Waldron,* 33 Mich. 232 ; *State* v. *Ward,* 61 Vt. 153 ; *Aurora* v. *Hillman,* 90 Ill. 61 ; *Railroad Co.* v. *Martin,* 112 id. 16 ; *Spear* v. *Drainage Comrs.* 113 id. 635 ; *Leonard* v. *Allen,* 11 Cush. 241 ; *Railway Co.* v. *Bronsard,* 79 Texas, 617 ; *Territory* v. *Clayton,* 8 Mon. 1 ; *Railway Co.* v. *Milles,* 2 Col. 442 ; *Shelby* v. *Clegett,* 46 Ohio St. 549 ; *Moore* v. *Haviland,* 61 Vt. 58.

Mr. Justice CRAIG delivered the opinion of the court :

This was a bill brought by Caroline Louise Carter, against Leslie Carter, in the Superior Court of Cook county, praying for divorce on the ground of extreme and repeated cruelty. Defendant put in an answer denying the acts of cruelty alleged, and charged complainant with various acts of adultery. Defendant also filed a cross-bill against complainant for divorce, charging the same acts of adultery set out in his answer to complainant's bill. To this cross-bill complainant answered, denying each and all of the acts of adultery with which she was charged. The cause was tried by a jury, and resulted in

a verdict finding the defendant not guilty upon the issues upon complainant's bill of complaint, and finding the complainant guilty of adultery as charged in the cross-bill. The court rendered a decree on the verdict, granting the defendant a divorce from the complainant on the ground of adultery, and awarded the custody of the only child, Leslie Dudley, who was eight years old, to the defendant. To reverse the decree the complainant appealed to the Appellate Court, where the decree was affirmed by a divided court.

The parties were married at Dayton, Ohio, on the 26th day of May, 1880. The complainant charged the defendant with acts of cruel treatment from the time of the marriage down to the time she sailed for Europe, in October, 1885. The acts of cruelty charged consisted of attempts on the part of the defendant to compel the complainant to submit to unnatural practices and unnatural desires, accompanied, as is alleged, on several occasions, with beating, striking and choking. These acts of cruelty, and any attempt to commit the unnatural acts alleged, were expressly denied. The specific charges of adultery upon which a trial was had before the jury, were the following: First, with an unknown person at Cooperstown, New York, in the months of August and September, 1882; second, with James F. Pierce, at Cooperstown, in August, 1883; third, with James B. Gilbert, at the Brunswick Hotel, in New York City, in September and October, 1886; and fourth, with Kyrle Bellew, in New York City, in September and October, 1886.

We have considered the alleged errors in the order in which they are discussed in the arguments of counsel.

It is first claimed in the argument that the verdict of the jury finding the defendant not guilty of the charges made in the bill was contrary to the weight of the evidence. But little need be said on this branch of the case. The charges in the complainant's bill rest mainly upon her unsupported evidence. Each and every charge was spe-

cifically denied by the defendant in his evidence before the jury, and there were many facts and circumstances in evidence tending to support his evidence. The truth of the charges in the complainant's bill, under such circumstances, was a question purely for the determination of the jury, and a verdict will not be disturbed where no error has intervened on the trial.

It is also insisted in the arguments that the verdict of the jury on the cross-bill was manifestly against the evidence. Much evidence was introduced by the respective parties upon this branch of the case. The evidence was conflicting, and it was the peculiar province of the jury to weigh the evidence, to reconcile it, so far as that cuold be done, and, after a full consideration of all the evidence, determine with which one of the parties the evidence preponderated. This has been done, and this court has held in many cases where the evidence is conflicting, the verdict of the jury must be final. It would serve no needful purpose, therefore, to enter upon a critical analysis of the evidence. The jury have found upon it, and under our uniform practice their verdict must be regarded as final where the issue has been fairly submitted by the rulings of the court.

The court refused the following instruction asked by the complainant, and the decision is relied upon as error :

"The jury are instructed that the evidence in this case is not sufficient to warrant the jury in finding that an act of adultery was committed by said Caroline Louise Carter with Kyrle Bellew in the city of New York, in the months of September and October, A. D. 1886, or at any time or. place."

This instruction, as is apparent from its terms, was a direction to the jury to find against the defendant on this charge, in the cross-bill, of adultery with Bellew. If the evidence introduced in support of this charge, with all the inferences the jury might justifiably draw from it, was so insufficient and weak that it would not support a

verdict had one been returned, and the court would have been bound to set the verdict aside on that account, then the instruction might have been given. (*Simmons* v. *Railroad Co.* 110 Ill. 340.) But we do not regard the evidence of that character. There was no direct and positive evidence introduced to sustain this charge. Circumstantial evidence was relied upon. Direct proof of the fact is not indispensable, but the rule is as established in *Bast* v. *Bast*, 82 Ill. 584. Adultery may be shown by proof of circumstances that naturally lead the mind to its belief by a fair inference, as a necessary conclusion.

It appears from the evidence in the record that Mrs. Carter met Bellew, a play actor, for the first time on the steamship "City of Rome," on her return trip from Liverpool to New York, in the month of September, 1886. On her arrival in New York she stopped at the Brunswick Hotel, where she remained from the 9th to the 15th of September. On the latter date, at the request of Bellew, Mrs. Carter left the Brunswick and went to the Colonnade, where he was residing. He engaged a room for her, near the rooms he occupied, and he had her baggage transferred from the Brunswick to the Colonnade. Here she remained, receiving instructions, as it is said, for the stage, of Bellew, until the 9th of October, when she sailed for Europe, Bellew escorting her to the steamer. On her return, on November 17, Bellew was there to meet her. She sent a note, by her servant, for him to meet her at the Fifth Avenue Hotel, and left the dock in a cab. During the time she stopped at the Colonnade Hotel she dined with Bellew at Delmonico's. He procured a box for her at the theater. She was in his company at other places, besides meeting him each day at his parlor in the hotel and receiving instruction in dramatic art. The fact that she stopped at the Colonnade and received instruction from Bellew was concealed from her husband.

Other facts of a kindred character were brought out in relation to the manner in which Mrs. Carter and Bellew

associated together, but it will not be necessary to refer to them here. Enough have been referred to to show the nature and character of the evidence. Whether this evidence was sufficient to establish adultery we are not called upon to determine. It tended to establish that fact, and it was competent, in connection with the other evidence, for the consideration of the jury, and we do not think the court erred in refusing the instruction.

The court refused the following, and the decision is relied upon as error:

"The jury are instructed that the evidence in this case is not sufficient to warrant the jury in finding that an act of adultery was committed by said Caroline Louise Carter with James F. Pierce, in Cooperstown, New York, in the month of August, 1883, or at any time or place."

We do not regard the decision refusing this instruction erroneous. If the jury believed the evidence introduced by complainant on the cross-bill to establish this charge of adultery there was evidence sufficient to maintain the charge. In the summer of 1883 Mrs. Carter was stopping at the Cooper House, in Cooperstown, New York. One Pierce also stopped at the same house for a few weeks. Mary H. Morrissey, who was house-keeper, testified that on a certain night near the last of August she was called up between three and four o'clock in the morning to attend upon a sick servant, and in coming down to the middle of the house she passed Mrs. Carter's room, and found Pierce standing by Mrs. Carter's door, his vest unbuttoned and his hat in his hand. Mrs. Carter was standing in the door in her night-dress. Nash, a night watchman at the house, testified that he had seen Pierce and Mrs. Carter driving, saw Pierce standing near Mrs. Carter's door talking to her one evening between eleven and twelve o'clock, and on one occasion he saw Pierce sitting on the arm of a rocking chair, on the piazza, in which Mrs. Carter was sitting. It was also shown that after an acquaintance of three weeks they corresponded.

In one of his letters he enclosed her poetry. There were other facts and circumstances introduced bearing on the charge. Much of this evidence was contradicted by Pierce and Mrs. Carter, and it was for the jury to pass upon the evidence, and give it such weight as they, in their judgment, might think it should receive, but the court had no right to take the evidence from the jury by an instruction. If it be true that Pierce was seen leaving Mrs. Carter's room between three and four o'clock in the morning, and she was seen at the door in her nightdress as he departed, these were facts from which the jury might reasonably conclude that an unlawful intimacy existed between them, and an instruction taking such evidence from the jury might be regarded erroneous.

It is next claimed that the court erred in its rulings in the admission of evidence. Mrs. Kate Gray was allowed to testify that in the summer of 1885 she resided on Bay street, in Cooperstown, New York; that she knew William Constable; that Mrs. Carter occupied a cottage near where witness lived; that several times she saw Mrs. Carter and Constable meet at the dock and go out on the lake together; that on one occasion, at six o'clock in the morning, she saw Constable walking up and down opposite witness' house, on the opposite side of the street; that he went as far as the corner at the end of the street, and walked back two or three times; that there was a high board fence on the easterly side of Bay street, which concealed him, when he was walking on the sidewalk, from Mrs. Carter's cottage and the houses beyond; that Mrs. Carter came around the corner and met Constable over near the lake; that witness then saw a girl come with a basket,—a lunch basket, as witness "supposed;" that Constable took the basket, and he and Mrs. Carter went to the lake and got into a boat and went off; that they went across the lake to a deserted beer garden.

The cross-bill contained no charge of adultery with Constable, and any evidence offered to prove that Mrs.

Carter was guilty of adultery with Constable was improper. The complainant had, however, charged in her bill continued ill-health from the time of her marriage down to her return from Europe, in November, 1886, alleging, as a cause, the cruelty of her husband, and she testified that during her stay at Cooperstown, in the early summer of 1885, her "health was very bad, and that she was extremely nervous and could not sleep, and was in a very bad way." This issue presented by the complainant was one that the defendant had the right to contest. He had the right to show that she was not in ill-health, not nervous and "not in a bad way." If she was able to rise in the morning at six o'clock, join a companion, and go rowing across the lake and spend a day, as shown by the evidence, she could not be in very bad health, and it was entirely proper to show that she was up at six o'clock in the morning and went off rowing, to meet the claim of poor health. In so far as the evidence of the witness tended to show improper relations between Mrs. Carter and Constable, that was excluded by the court, as shown by an order in the record, as follows: "That all that has been said concerning Mr. Constable be stricken from the deposition of Kate Gray."

It is also claimed that the court erred in allowing evidence to be introduced that Constable furnished the complainant with large sums of money while she was in Europe. In her amended bill the complainant alleged that in August, 1885, she went to Europe and returned in September; that by the advice of physicians she again went to Europe in the latter part of October, 1885; that she remained in Europe about one year, and during nearly all of said time she was under the care of physicians, and at one time she was so ill that her life was despaired of; that during her absence in Europe she repeatedly requested her husband to send her child and mother to her, as it would greatly aid in her recovery, but he refused to do so; that her husband, although a man of large means,

refused to furnish any portion of the moneys necessary for her support during her trips to Europe; that she was obliged to sell her wardrobe to pay part of the expenses, and to rely upon means derived from her mother and a lady friend for support while in Europe.

Regarding this portion of the bill, the defendant denied that his wife was advised by physicians to return to Europe; denied that his wife, while in Europe, was under the care of physicians; admitted that he refused to send her son and his wife's mother to Europe, for the reason that it was his wife's duty to return to her home and family and remain there, and because said request was not made in good faith; admitted that he himself refused to go to Europe because he deemed it her duty to return to her home; denied that he is a man of large means, and that he had refused to furnish the money necessary to support his wife, and that she was obliged to sell her wardrobe to defray part of her expenses, and to rely upon means derived from her mother and a lady friend for her support in Europe. The defendant also set up in his answer that complainant deceived him, in that she informed him she was living in Europe quietly and at small expense, and this led the defendant to believe that the money she claimed to have when she left for Europe on August 1, 1885, was sufficient to pay said traveling and living expenses, and that if the money proved insufficient she would call upon him for more, or return home, as he desired her to do; that in the autumn of 1886 he first learned that she had been living in Europe in a very expensive manner; that she had purchased carriages and rented a house in Basle, Switzerland, and that her conduct had given rise to great scandal and comment. He averred, upon information and belief, that she spent between August 1, 1885, and December, 1886, the sum of at least $20,000 in excess of the money which he was led to believe she had when she sailed from New York on August 1, 1885. It was also alleged in the cross-bill that the com-

plainant in the bill remained abroad until September 1,
1886, and during her absence indulged in great extrava-
gance and loose conduct; that he had been informed that
she expended upwards of $25,000 during her absence, pur-
chasing carriages and employing many servants, renting
a house, buying expensive apparel, and otherwise giving
way to luxurious and expensive habits utterly inconsist-
ent with her condition in life and that of orator, and so
conducted herself with men as to acquire a thoroughly
bad reputation.

In the answer to the cross-bill the complainant ad-
mitted that she remained abroad until September 1, 1886,
but denied that she indulged in extravagance and loose
conduct, or that she expended the sum of money alleged,
or that she gave way to luxurious and expensive habits;
that during almost the entire time of her absence she was
under the care of physicians; that her husband failed and
refused to furnish her with money for the expenses of
either of her trips; that all the money expended in her
trips was furnished by her mother and a lady friend.

It thus appears from the pleadings that complainant's
mode of living while in Europe, the cause of her going
abroad, the condition of her health, and the amount of
her expenditures, and the source from which she obtained
moneys, were made issues. The complainant, in her direct
examination, said, the day before she started for Europe
"I told him I intended to support myself in whatever way
I could,—get employment if I could. He did not offer me
any money then, and he did not ask me any questions as
to what money I had." Upon cross-examination the com-
plainant, in substance, testified: "When I went to Europe
in August, 1885, I was furnished a part of my means by
mother and part I had saved. I don't remember how
much money I had. I had a letter of credit from Kidder,
Peabody & Co., of New York. I took out that letter of
credit in my own name, Louise D. Carter. I don't remem-
ber the amount of this letter of credit. I did not receive

any money from my husband while I was in Europe. I could not tell how much money I spent while there. I did not receive any money from any gentleman other than my husband. I know where the money came from. There is an account of my money matters, but I have not looked it over."

Upon the further examination of the complainant it appeared that she had purchased carriages and costly apparel while in Europe, and that she had expended large sums of money. Indeed, complainant had claimed, all through her evidence, that her going to Europe was on account of the cruel treatment of her husband and on account of her health. Not only by the pleadings, but by the complainant's own evidence, it became important to inquire whether complainant was abroad as an invalid, for her health, being furnished money by her mother, or whether she was then living in luxury and in an extravagant manner, being supplied by men other than her husband. Upon these questions depositions were read which showed that the complainant had, during the year, or perhaps a little less than a year, while on her European trip, received and spent about $49,000. It also appears from the same evidence that this money came from Constable. The evidence was not offered for the purpose of showing improper relations between complainant and Constable, nor could it be offered for such purpose, as there was no charge of that character in the pleadings. We think it was competent to show the manner in which she lived in Europe, the amount of money she received and the source from which it came. Indeed, it would be difficult to show the money she had received, without at the same time proving the person who furnished the money.

On the re-examination of complainant her counsel made the following offer of proof: "We offer to prove that Mrs. Constable was a wealthy lady in her own right; that she was childless herself; that Mrs. Carter related,

to a great extent, the nature of her troubles to Mrs. Constable ; that she became interested in Mrs. Carter, and assured Mrs. Carter that she would assist her financially on her trip ; that Mrs. Carter understood that assistance was to be sent to the bank, and when it came from the bank it was to be a full verification of what she understood Mrs. Constable was to do, and received it with that understanding." This offer was objected to, and the objection sustained. What Mrs. Carter may have understood or believed was not the question made by the pleadings, or involved. The real question involved was who furnished the money. If Mrs. Carter knew the real source she might have stated it, but her understanding or belief was not competent evidence of the fact. If Mrs. Constable agreed to furnish Mrs. Carter money to spend in Europe, and actually furnished her $49,000, which was spent in one year, why not produce Mrs. Constable as a witness and establish the fact by her ? The testimony of Mrs. Constable would have been ample to have placed the matter at rest, but she was not called as a witness, nor is any explanation offered of her absence.

The court having denied complainant the right to show her belief as to the source from whence the money came, she, by her counsel, moved for leave to strike out of her bill the allegation that Carter failed and refused to furnish her with any of the money required for her support while in Europe, and that she was obliged to rely upon means derived from her mother and a lady friend. This motion the court denied. Whether the court would allow complainant to amend her bill on the trial was a question resting in the sound discretion of the court, and we do not think that discretion was abused in this case.

It is also claimed that the court erred in refusing complainant the right to prove by Mrs. Dudley what arrangement she made with Mrs. Constable in regard to furnishing money. If a contract was made by Mrs. Dudley with Mrs. Constable, by which Mrs. Constable agreed to

furnish Mrs. Carter money, it may be that a contract of that character might have been admissible, if followed with other evidence that Mrs. Constable actually furnished the money; but the fact, alone, that a contract was made would not determine the question who furnished the money, and the decision of the court refusing the introduction of the evidence was not such an error as would work a reversal of the judgment. A letter written by Mrs. Constable to Mrs. Dudley on the subject was also offered in evidence and excluded by the court. We perceive no ground upon which the letter was admissible. It was a mere declaration or statement of a third party, which could not be binding on the defendant.

In this connection it is claimed that the court erred in refusing instructions numbered 7, 8, 9 and 11, asked by the complainant, in relation to the evidence which had been introduced in regard to the money transmitted to Mrs. Carter while in Europe. These instructions, in substance, directed the jury that the evidence in regard to the money was not relevant to any issue in the case, and they should disregard it. In complainant's tenth instruction the jury were instructed that Mrs. Carter was not charged in the answer or cross-bill with any act of adultery with Constable. Under this instruction the jury could not consider the evidence in reference to the money transmitted as proving any act of adultery with Constable, and this was all complainant could properly ask. If the evidence was admissible on other issues involved, as we have attempted to show it was, the court was not at liberty to direct the jury to disregard it.

Complaint is next made of defendant's instruction No. 4, which directs the jury that they should take into consideration the whole of the evidence and all the facts and circumstances proved on the trial. We perceive no objection to this charge. It is always the duty of the jury to consider all the evidence introduced, and all the facts and circumstances in evidence, in arriving at a ver-

dict, and it is not error for the court to instruct them to discharge this duty.

It is also insisted that the court erred in allowing the defendant to put in evidence the Deming letters, and in refusing to give instructions 13 and 14, which, in substance, directed the jury that Mrs. Carter is not charged with committing adultery with Deming, or any improper relations with him, and the letters could only be considered with reference to the crime of the assault which was alleged to have occurred at the Fifth Avenue Hotel, in New York, in November, 1884.

Mrs. Carter had testified, that in November, 1884, at the Fifth Avenue Hotel, New York, she had trouble with her husband on the eve of going to a party ; that he made unnatural advances and then struck her because she would not submit, and that she threw a pitcher of water upon him. In answer to this, Carter denied the charge, and said the difficulty arose from his discovery in his wife's possession of some unsigned letters, which he read to her, and she thereupon became angry and threw the water. Carter was allowed to read these unsigned letters in evidence, and to testify that they were in the handwriting of one Charles C. Deming, of New York. That a slight difficulty occurred between the parties at the time and place mentioned is a conceded fact. The question in dispute was as to the cause of the difficulty. All that was said and all that occurred at the time may be regarded as a part of the *res gestœ*, and admissible in evidence. He claimed that the difficulty grew out of the contents of the Deming letters, which were torn up and thrown into a bucket, and that he afterwards gathered up the pieces and put them together. As a part of the transaction we think it was proper to read the letters to the jury, although they might have had a tendency to show improper relations between Deming and Mrs. Carter. The letters were a part and parcel of the transaction which was in issue, and as such we perceive no ground upon which they

could be excluded. The letters could not be read in evidence for the purpose of proving adultery with Deming, because there was no charge of that character in the cross-bill, and the defendant had no right to go beyond the allegations of his cross-bill in proving any act of adultery; but this principle was so clearly placed before the jury in other instructions that no necessity existed for giving complainant's thirteenth and fourteenth instructions. In complainant's tenth instruction the jury were expressly told that Mrs. Carter was not charged with any act of adultery with Deming, and in No. 1 the jury were, in direct terms, informed that the question presented for their consideration and determination, under the cross-bill, was, whether Mrs. Carter had committed the acts of adultery set forth in the cross-bill, namely, four specified acts set out in the instruction, as they were alleged in the cross-bill. Under these specified charges it was not possible for a jury of twelve intelligent men to travel outside of the record, and undertake to find charges of adultery proven which were not involved in the case,—charges which they had been positively instructed were not to be considered. It often occurs in the trial of a cause that certain evidence is admissible upon a single issue, while there may be another issue upon which the evidence would be incompetent and improper. In such a case the court might admit the evidence, but by instruction confine its operation and effect to the issue in the case, and that issue alone, upon which it has a legitimate bearing. That course might have been pursued here and the two instructions might properly have been given; but, as said before, in view of the other instructions which had been given, confining the jury to the charges of adultery specified in the cross-bill, no harm was done by the refusal of the instructions.

It is next claimed that the court erred in permitting the witness Henry Crawford to give his opinion, from what occurred in a room adjoining one occupied by him

in the Brunswick Hotel, New York, whether adultery was committed by Mrs. Carter. It appears from the evidence that in April, 1884, Crawford and his wife occupied room 10 on the second floor of the Brunswick Hotel. Mrs. Carter occupied room 11. There was a door between the two rooms, and on two nights in succession, soon after eleven o'clock, Crawford testified that he heard conversations between Mrs. Carter and Dr. Gilbert in her room. The conversations were given, and noises and movements on a lounge just across the intervening door, which he heard, were described to the jury. In the conversations heard the witness testified that he heard Mrs. Carter call the person who was in the room with her, by name. "She called him Dr. Gilbert. * * * She told him she loved him better than she did anybody on earth." The witness also testified: "Besides other expressions I have mentioned, I heard Mrs. Carter say on the first evening, or make an inquiry of the person that was in the room, as to whether or not he had not enjoyed himself as well with her as with other ladies. He asked her whether she was not aware she might get into some trouble in consequence of what had been done, to which her response was that she looked to him to protect her in that respect. I remember, also, she asked him whether or not he did not think she had good taste in stockings and garters. She also asked him to remain in the room all night, to which his response was that it would be unsafe and unwise, and her response to that was 'that as he was her family physician no one would have any right to make any remark on it.'" The witness was then asked whether or not Mrs. Carter and Dr. Gilbert, on either of these evenings, committed the act of adultery in that room. A. "My only answer to that is, not being in that room, that I can only answer what my impressions were, or conclusions, from what was said and what I heard." Q. "What were your conclusions?" A. "My conclusions from what I heard,— that being the direct question put to me,—were, that there

was an act of adultery committed by persons in that room." Q. "Now, if you will give, Mr. Crawford, the reasons for such conclusion, what you heard, in addition to the conversation you have stated?" A. "I should say about an hour and three-quarters, or two hours, possibly, after we came to our room, I heard the voices of a man and woman just across the intervening door, on a sofa or lounge, and from the language which I have before somewhat detailed, and the other sounds which I heard—" Q. "What sounds?" A. "Well, kisses and low words of endearment, and the rustle of dresses, I came to the conclusion that there was an act of adultery being performed in the next room. I heard the male voice on the second evening ask where he could get some water, and stated that he had brought a syringe, and I heard a noise that might ordinarily accompany the working of a bulb syringe. He gave no reason for his bringing the syringe."

It may be conceded, as a general rule, witnesses who are not testifying as experts are not allowed to state their opinions,—they are to declare the facts, and it is for the jury to draw conclusions from the facts. There are, however, exceptions to the general rule. An ordinary person may give his opinion, in a proper case, whether a certain person was intoxicated, as held in *Aurora* v. *Hillman*, 90 Ill. 61. In *Spear* v. *Drainage Comrs.* 113 Ill. 632, it was held that persons living in the neighborhood of lands which it is proposed to drain may give their opinions as to what extent, if any, it would increase the value of the lands, and in deciding the case it was said : "It is only in cases where a previous habit or study is essential to the formation of the opinion sought to be put in evidence, that all but experts are excluded." It is the constant practice to permit non-professional witnesses to give their opinions upon matters relating to time, distance, weight, values, etc.; also in respect to the appearance of persons or things, when such an inquiry becomes important in a judicial proceeding.

In *Steele* v. *Ward*, 61 Vt. 153, a question arose in reference to the admissibility of the opinions of witnesses, and in disposing of the question, among other things, the court said : " "A witness is allowed to state appearances in any case where they are, in their nature, incapable of exact and minute description, *e. g.*, the health or sanity of a person, the appearance of a person when charged with crime, and, 'where the facts are of such character as to be incapable of being presented with their proper force to any one but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them without the aid of the judgment or opinion of the witness who had the benefit of personal observation, he is allowed, to a certain extent, to add his conclusion, judgment or opinion.' *Bates* v. *Sharon*, 45 Vt. 474 ; *Crane* v. *Northfield*, 33 id. 124 ; and see *Stowe* v. *Bishop*, 58 id. 500 ; *Knight* v. *Smyth*, 57 id. 529."

*Gahn* v. *City of Ottumwa*, 60 Iowa, 429, is a case where the question arose as to the admissibility of the opinion of a witness as to the cause of an accident, where an action had been brought to recover damages for an injury received by the plaintiff through the negligence of the defendant. In deciding the question, the court, among other things, said : "It is competent for a witness to testify to his conclusion when the matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time. It appears to us that the subject matter—the alleged fright of the horses, in this case,—was of the character just described. A witness may see a team frightened, and may state the fact that water was thrown from a hose upon or near the team, and he may describe how and when it was thrown, and yet he cannot put the jury in his place, in regard to the facts, without stating his conclusions as to the effect of the throwing of the water."

Numerous cases may be found in the books where it has been held competent for a witness to give his judg-

ment or conclusions based upon facts which had come under his observation. Thus, in *Commonwealth* v. *Dorsey*, 103 Mass. 412, it was held that a person not an expert might give his opinion whether certain hairs are human hairs, and in *Leonard* v. *Allen*, 11 Cush. 241, it was held that a witness might state what he understood by certain expressions, gestures and intonations, and to whom they were applied. In *McKee* v. *Nelson*, 4 Cow. 355, it was held that a witness who had observed the conduct and relations of two persons to each other, may testify whether, in his opinion, the two were attached to each other. In *People* v. *Earlwood*, 4 Kern. 562, it was held that a witness might give his judgment whether, at a given time, a person was intoxicated. *Commonwealth* v. *Sturtevant*, 117 Mass. 122, is an interesting case on the question. Among other things it is there said: "The exception to the general rule that witnesses cannot give opinions, is not confined to the evidence of experts testifying on subjects requiring special knowledge, skill or learning, but includes the evidence of common observers, testifying to the results of their observations, made at the time, in regard to common appearances or facts, and a condition of things which cannot be reproduced and made palpable to a jury. Such evidence has been said to be competent from necessity, on the same ground as the testimony of experts, as the only method of proving certain facts essential to the proper administration of justice." After citing a number of authorities the court said: "The competency of this evidence rests upon two necessary conditions: First, that the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time; and second, that the facts upon which the witness is called to express his opinion are such as men in general are capable of comprehending and understanding."

We think it may be safely said that the testimony of Crawford would fall within the rule established by the

cases cited. The sounds and the noises which the witness heard in the adjoining room could not be reproduced or described to the jury precisely as they appeared to the witness at the time, and the facts upon which his judgment and opinion were asked were such as men in general are capable of comprehending and understanding. But if we are not correct in this, and it was an error to allow the witness to give his opinion, the error could do no harm, for the reason that the opinion of the witness added nothing to the facts he had detailed. From the facts detailed by the witness but one conclusion could be reached, and the opinion of the witness could add no additional force to that conclusion, and hence no injury resulted from the admission of his opinion.

A few other questions have been raised in the argument in regard to the ruling of the court on the evidence, and also in reference to the ruling of the court on some of the instructions, but we do not regard the questions of sufficient importance to merit an extended discussion. We have given the questions a careful consideration, and it is sufficient to say that we find no error of sufficient magnitude to authorize a reversal of the judgment. Much time was consumed in the trial of the cause in the circuit court, and the record is quite voluminous, and it may be true that slight errors may be found in the record. Indeed, it is hardly possible to prevent slight errors from getting into the record in the trial of a cause of this magnitude. But a judgment or decree should not be reversed unless an error has been committed which has worked an injury to the party complaining. We find nothing of this character in this record.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE BAKER: I concur in the judgment of affirmance, but not in all the doctrines announced in the opinion.

Afterward, upon rehearing, the following additional opinion was filed:

Per CURIAM: Since the rehearing was granted in said cause we carefully considered the record and the able argument of counsel, and after full consideration of the cause we have reached the same conclusion we did when the cause was here before. The judgment of the Appellate Court will be affirmed, and the opinion heretofore filed will be re-filed as the opinion of the court.

*Judgment affirmed.*