THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GREGORY M. SASSU, Defendant-Appellant.

First District (1st Division)   No. 83—2788

Opinion filed November 10, 1986.—Rehearing denied February 3, 1987.

Adam Bourgeois, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Donna B. More, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Gregory Sassu, was convicted of murder and voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 9—2, respectively), and sentenced to concurrent terms of 40 years and 15 years in the Illinois Department of Corrections. On ap-

peal defendant contends that: (1) his constitutional rights to effective assistance of counsel, fair trial, and due process were violated by prosecutorial misconduct; (2) the trial court erred in denying him leave to exercise a peremptory challenge; (3) the trial court erred when it permitted hearsay expert testimony; (4) he was prejudiced by the prosecutor's remarks during rebuttal argument; and (5) the jury was not properly instructed as to the offense of voluntary manslaughter with respect to the death of Dwight Valentino. For the reasons that follow, we affirm the judgment of the trial court.

The record sets forth the following facts pertinent to this appeal. On the afternoon of January 30, 1983, at an apartment located in Schaumburg, defendant shot and killed Dwight Valentino and Ken Wangerin. At trial, Barry Gross, assistant State's Attorney, testified that in the early morning hours of February 2, 1983, he met with defendant at Schaumburg police headquarters. After being read his rights, defendant told Gross that he had last seen Dwight at approximately midnight on Saturday, January 29, 1983. Earlier that day, Dwight had called him at his parents' home in Maywood and asked if he could borrow defendant's car later that day to pick up a friend at the airport. Defendant agreed to loan the car to Dwight, provided that Dwight would drive defendant to work and pick him up later that evening. Defendant then picked up Dwight in Schaumburg; the two drove to defendant's place of employment in Evanston, and Dwight then drove to the airport. Approximately 11 p.m. that evening, Dwight and his fried, Ken Wangerin, picked up defendant at work and the three drove to Dwight's apartment in Schaumburg. Defendant stayed for one beer and then left. The next morning, defendant drove out to Schaumburg to pick up Dwight and Ken and to drive them to defendant's parents' house to watch the Super Bowl game. When no one answered the door at Dwight's apartment, defendant left and drove to Maywood to see his fried, Jeff Lowenthal.

When defendant finished his explanation of the events, Gross told him that he had just spoken to Lowenthal and knew about the gun. Defendant then began to cry, and, after regaining his composure, confessed to the shootings. In his confession defendant essentially repeated his first version of what had transpired on Saturday. However, a different version emerged with respect to the events of Sunday, January 30. On that day, when defendant arrived at Dwight's apartment at approximately 11:30 a.m., both Dwight and Ken were "stoned" on marijuana. Defendant left the apartment for a few minutes to purchase a six-pack of beer. When he returned to the apartment, he gave a beer to Dwight and Ken and took one himself. After

finishing the beer, defendant walked into the kitchen to throw away the bottle. When he walked back into the living room, Ken was twirling a gun around his finger. Suddenly, the gun went off, shooting Dwight in the neck. Immediately, defendant grabbed the gun out of Ken's hand and shot him in the chest. He then turned around and looked at Dwight, who was bleeding profusely from the neck, and shot Dwight to end his misery.

At trial defendant presented a slightly different version of the events which had occurred on Sunday, January 30. Defendant testified that when he returned from purchasing the beer, he found Dwight and Ken arguing over payment for the marijuana that Ken had brought with him from Chicago. Ken then started to spin a .22-caliber Ruger pistol around his finger. The gun went off and the bullet hit Dwight in the neck as he was sitting at his desk. Blood began gushing from Dwight's neck and he was moaning for help. Defendant grabbed the gun from Ken, turned around and looked at Dwight. At that point, Ken started to laugh. Defendant turned back toward Ken and the gun went off. Defendant stated that he did not recall having pulled the trigger and had not intended to kill Ken. When he turned around again to look at Dwight, the gun went off and shot Dwight for the second time. Defendant then pumped the bullets out of the gun, grabbed his coat, knapsack, and the gun and drove to Lowenthal's hardware store. Defendant told Lowenthal that there had been an accident. When he took the gun out of his knapsack to give it to Lowenthal, it went off again, blowing a hole in the ceiling of the store. Lowenthal then took the gun, and defendant left to go to work.

Jeffrey Nathan then testified that in December 1982 he had given a .22-caliber Ruger pistol to Jeff Lowenthal and asked him to sell it for him. Lowenthal testified that he had received the .22-caliber Ruger from Nathan in mid-January 1983 and had given it to defendant a few days later. He next saw the weapon on the afternoon of January 30, 1983, when defendant came into his store, carrying it, and told Lowenthal that he had just shot someone. When defendant pulled the gun out from under his coat to give it to Lowenthal, it accidentally discharged a bullet to the ceiling.

Dr. Michael Schaffer, chief toxicologist for the Cook County Medical Examiner, then testified that he had examined blood samples from Dwight and Ken and had found no traces of barbiturates, opiates, or cocaine. Further, a test performed by the Center for Forensic Sciences in Toronto, Canada, to detect the presence of marijuana or its active metabolites indicted that there had been no recent use of marijuana by either Dwight or Ken. The only positive results regarding

the presence of drugs was with respect to alcohol. However, the level of alcohol was significantly less than the legal intoxication level.

Following closing arguments, the jury adjourned, returning with a verdict of guilty of the murder of Dwight and guilty of the voluntary manslaughter of Ken. The court then entered judgment on the verdict. Thereafter, defendant's motions for new trial and arrest of judgment were denied and the court sentenced him to concurrent terms of 40 years' imprisonment for murder and 15 years' imprisonment for voluntary manslaughter. Defendant's timely appeal followed.

■ On appeal defendant first contends that the trial court erred in denying his motion to dismiss his indictment on the grounds that the State had violated his constitutional rights to effective assistance of counsel, a fair trial, and due process of law when it told State's witness, Jeffrey Lowenthal, not to discuss the case with anyone prior to trial, thereby preventing defense counsel from interviewing Lowenthal.

Supreme Court Rule 415(a) (87 Ill. 2d R. 415(a)) states that "neither the counsel for the parties nor other prosecution or defense counsel shall advise persons having relevant material or information (except the accused) to refrain from discussing the case with opposing counsel or showing opposing counsel any relevant material, nor shall they otherwise impede opposing counsel's investigation of the case." However, the Illinois Supreme Court has held that Rule 415(a) "does not abrogate the general proposition that a prosecution witness need not grant an interview to defense counsel unless he chooses to do so." (*People v. Peter* (1973), 55 Ill. 2d 443, 451, 303 N.E.2d 398.) Thus, in order to comply with Rule 415(a), a witness cannot be advised not to talk to opposing counsel. However, he can be informed that it is his decision as to whether he wants to speak to opposing counsel and that he is under no legal obligation to either discuss the case or to refrain from discussing it with opposing counsel or his agents.

In the present case, at the hearing on defendant's motion to dismiss the indictment, Ronald Green, an investigator for Hawk Detective Service, testified that he initially met Lowenthal in the latter part of April 1983 when he attempted to interview Lowenthal at his place of employment on behalf of defendant. At that time, Lowenthal refused to be interviewed, stating that the assistant State's Attorney had told him not to speak to anyone. Green returned several times thereafter, and, on at least three of those occasions, Lowenthal reiterated that he had been told by the State not to speak to anyone.

On May 7, 1983, Green asked Lowenthal to sign a statement stating that the assistant State's Attorney had told him not to speak to

anyone regarding the case. Although Lowenthal signed the statement, he nevertheless consented to answering Green's questions that day, informing him that defendant had arrived at the hardware store on January 30 carrying a gun, which accidentally discharged a bullet into the store's ceiling. In October 1983, shortly before trial, Green returned to Lowenthal's place of employment on three consecutive days. The first day, Lowenthal allegedly told Green once again that the assistant State's Attorney had told him not to talk to anyone. On the second day, Lowenthal told Green that the assistant State's Attorney had told him that he did not have to speak to anyone if he did not want to do so. On the third day, Lowenthal told Green that he would speak to defense counsel that Friday. When defense counsel told Green that Friday was too late, Green attempted to talk with Lowenthal earlier, but Lowenthal refused.

Based upon Green's testimony, the trial court denied defendant's motion for the following reasons: (1) any misunderstanding Lowenthal had had as to his freedom to be interviewed by defense counsel had been cleared up prior to trial; and (2) Lowenthal actually spoke to Green in May 1983. We concur with the trial court's decision. In doing so, we note that at no time between April 1983 and October 1983 did defense counsel make any attempt to contact the State's Attorney in order to clear up any misunderstanding Lowenthal may have had regarding his freedom to discuss the case. Further, despite Lowenthal's reluctance to speak to Green, he did discuss relevant facts with him, including the fact that defendant had brought a gun to Lowenthal's store on the afternoon of the murders. Accordingly, we do not find that defendant's constitutional rights to effective assistance of counsel, fair trial, or to due process of law were violated.

■ Next, defendant argues that the trial court erred in denying his motion to reconsider his previous acceptance of a juror. Preliminarily, we note that the record does not contain a transcript of the *voir dire* proceedings. Thus, the actual sequence of events leading up to the trial court's denial of defendant's motion is unknown to this court. However, the record does contain a transcript of the proceedings during which defendant argued his motion. Pursuant to that argument, approximately 90 minutes after Mary O'Neil had been accepted by both the State and defendant as a juror, she indicated to the court that she had some reservations as to whether she could be fair to defendant. At defendant's request, the court agreed to examine O'Neil in chambers. During this examination, O'Neil indicated that she had become concerned that her employment as a teacher would cause her to give more credence to the testimony of persons in au-

thority than to young people, such as defendant. However, upon further examination, O'Neil stated unequivocally that she did not feel prejudiced against one side or the other and that she could be fair to both sides and reach a decision based upon the evidence. When the court concluded its questioning of O'Neil, it asked defense counsel if there was "[a]nything further?" Defense counsel replied, "No, I'm satisfied." The trial then commenced.

In our view, the record is clear that any doubts which defense counsel may have had regarding the fair-mindedness of juror O'Neil were removed as a result of the hearing in chambers. At the conclusion of the hearing in chambers, defendant indicated his acceptance of O'Neil to the trial court, and the court then proceeded with the trial. Defendant cannot now change his position and argue that he remained dissatisfied following the hearing and would not have accepted O'Neil as a juror had he known her background earlier. See *People v. Sanders* (1986), 143 Ill. App. 3d 402, 493 N.E.2d 1.

■■ ■ Defendant next contends that the trial court erred when it permitted the hearsay testimony of Dr. Michael Schaffer regarding a test performed by an outside forensic laboratory to determine the presence or absence of marijuana in the victims' blood. In addition, defendant argues that the State failed to provide a sufficient foundation for Dr. Schaffer's testimony regarding the laboratory results of the test for marijuana.

With respect to the hearsay contention, since the Illinois Supreme Court's adoption in 1981 of Federal Rules of Evidence 703 and 705, Illinois courts have permitted expert witnesses to give an opinion based upon either firsthand or secondhand facts not in evidence, provided that the information relied upon is of a type reasonably relied upon by experts in their particular field in forming opinions or inferences upon the subject. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) In the present case, Dr. Schaffer, chief toxicologist for the Cook County Medical Examiner, testified that there is only one type of instrument in forensic science which can give an "unequivocally positive confirmation for marijuana or its active metabolites." One of these instruments is located at a forensic laboratory in Salt Lake City, Utah, and another in Canada. Because the instrument located in Utah was "down" at the time Dr. Schaffer was ready to send the victims' blood sample for testing, he sent them to Canada and, subsequently, received the test results verbally. Based on this information, Dr. Schaffer testified at trial as to his opinion of the amount of marijuana present in the victims' blood. In giving his opinion, Dr. Schaffer stated that the information he received from the Canadian

forensic laboratory was of the type customarily relied upon in his profession. Based upon these facts, we find no error in allowing Dr. Schaffer's expert testimony as to the test results.

With respect to the insufficient-foundation contention, defendant alleges that the State failed to lay a sufficient foundation for Dr. Schaffer's testimony regarding the laboratory results of the test for marijuana. In presenting this argument, defendant attempts to equate the doctor's admitted lack of expertise in determining marijuana intoxication levels with his well-established expertise in quantifying the presence of marijuana's active ingredients in the blood. Dr. Schaffer offered no opinion as to whether the victims were intoxicated from marijuana. Rather, he restricted his opinion to whether the active ingredients were present. In our view, the State sufficiently established Dr. Schaffer's expertise to render the latter opinion. Based upon Dr. Schaffer's expert credentials, we find defendant's reliance on *People v. Adams* (1981), 102 Ill. App. 3d 1129, 430 N.E.2d 267, misplaced. In *Adams*, defendant failed to establish his expert's qualifications for the opinions sought. Accordingly, we find the trial court properly admitted Dr. Schaffer's testimony as to the presence of marijuana in the victims' blood.

■■ ■ Next, defendant argues that the State's improper and prejudicial remarks during rebuttal argument denied him a fair trial. In response the State asserts that its comments were proper as either fair comment on the evidence or as invited reply. Upon review of the record, it is our opinion that defendant has waived this issue for review by his failure to object at trial to the comments which he has alleged to be improper. (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.) Moreover, we do not find that any error has occurred which acts to prejudice substantial rights of the defendant so as to invoke our review under the plain-error doctrine. 87 Ill. 2d R. 615(a).

■■ We further note that, in raising the improper-rebuttal-argument issue, defendant asserts that the improper remarks in conjunction with Jeffrey Nathan's testimony at trial regarding defendant's participation in the robbery of a cocaine dealer "eliminated any chance the defendant may have had in obtaining a fair trial." We disagree. Following Nathan's testimony, defendant moved for a mistrial based upon Nathan's comments regarding the robbery. The court denied the motion on the ground that the testimony was irrelevant to the issue at bar, but agreed to admonish the jury to disregard any testimony regarding the robbery of a cocaine dealer. We find that the court's admonishment was sufficient to cure any possible prejudice. See *People v. Baptist* (1979), 76 Ill. 2d 19; *People v. Panczko* (1980),

86 Ill. App. 3d 409.

■ Defendant next contends that because he was not proved guilty beyond a reasonable doubt of murder, the trial court erred in refusing to instruct the jury on voluntary manslaughter as to Dwight Valentino. We disagree. Section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) defines the offense of voluntary manslaughter as follows:

> "(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
>   (1) The individual killed, or
>
>   (2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.
>
>   Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

It is well established that a person accused of murder is entitled to an instruction on the lesser included offense of manslaughter only if there is evidence which, if believed by the jury, would reduce the offense from murder to manslaughter. *People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378; *People v. Barnes* (1982), 107 Ill. App. 3d 262, 437 N.E.2d 848; *People v. Peery* (1973), 11 Ill. App. 3d 730, 297 N.E.2d 643.

Pursuant to section 9—2, in order for the evidence in the present case to support a jury instruction for voluntary manslaughter as to Dwight, it would have to establish either that: (1) defendant purposefully killed Dwight in a moment of sudden and intense passion created by Dwight's provocation, or (2) defendant accidentally killed Dwight while attempting to kill Ken in a moment of sudden and intense passion created by Ken's provocation. With respect to the first alternative, there is no evidence that Dwight provoked defendant at any time. With respect to the second alternative, although there is evidence that Ken provoked defendant by laughing after Dwight had been shot, there is no evidence that defendant accidentally shot Dwight while attempting to kill Ken. In fact, defendant denies that he ever intended to shoot Ken, claiming that the gun accidentally discharged after he took it from Ken. Accordingly, we concur with the trial court that there is no evidence to support an instruction on the offense of voluntary manslaughter as to Dwight.

■ Finally, although defendant raises the issue that he was not proven guilty of murder beyond a reasonable doubt as a prelude to his argument regarding the allegedly improper omission of the voluntary

manslaughter instruction, he presents no argument in his brief to support the reasonable doubt allegation. Accordingly, we find that this issue is waived for review. *People v. Fink* (1982), 91 Ill. 2d 237, 437 N.E.2d 623.

For the aforementioned reasons, we affirm the judgment of the circuit court.

Affirmed.

O'CONNOR and BUCKLEY, JJ., concur.